IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHNNIE LEE FIELDS,<br><br>                    Petitioner,<br><br>          vs.<br><br>MATTHEW CATE, Secretary, California<br>Department of Corrections and<br>Rehabilitation,<br><br>                    Respondent. | No. 2:11-cv-02205-JKS<br><br>MEMORANDUM DECISION |

Johnnie Lee Fields, a state prisoner appearing *pro se*, filed a Petition for a Writ of Habeas

Corpus under 28 U.S.C. § 2254.  Fields is currently in the custody of the California Department

of Corrections and Rehabilitation, incarcerated at the Sierra Conservation Center.  Respondent

has answered, and Fields has replied.  Fields also requests an evidentiary hearing be held.

## I.  BACKGROUND/PRIOR PROCEEDINGS

In January 2008, following his conviction by a jury in the Yolo County Superior Court of

second-degree murder (Cal. Penal Code § 187(a)) and assault on a child under eight with force

(Cal. Penal Code § 273ab), Fields was sentenced to an indeterminate prison term of twenty-five

years to life.  The California Court of Appeal, Third Appellate District, affirmed Fields'

conviction and sentence in an unpublished decision,[1] and the California Supreme Court denied

review on December 2, 2009.  On May 13, 2010, Fields filed a petition for habeas relief in the

---

[1] *People v. Fields*, No. C058413, 2009 WL 2586773 (Cal. Ct. App. Aug. 24, 2009).

Yolo County Superior Court, which was summarily denied for failing to make a prima facie

showing of entitlement to relief.  The California Court of Appeal, Third Appellate District,

summarily denied his subsequent habeas petition without opinion or citation to authority.  Fields

then filed a petition for habeas relief in the California Supreme Court that was also summarily

denied without opinion or citation to authority on January 21, 2011.  Fields timely filed his

Petition for relief in this Court on August 15, 2011.

The facts underlying the conviction were summarized by the Appellate Division:

Kimberly Linares, the mother of victim Kaysha F., testified her daughter was born on September 6, 2003.  Defendant was Kaysha's father.  Once when they lived in Kennewick, Washington, she and defendant were engaging in horseplay, but when she accidentally hurt him, he kneed her in the nose three times by grabbing her hair and putting her head to his knee.  While defendant was serving a jail sentence for that incident, she learned she was pregnant with Kaysha.  Kaysha was healthy at birth. Shortly after leaving the hospital, Kimberly was breastfeeding Kaysha and turned on the television, but defendant smacked her on the back of the head and called her "an inconsiderate bitch because I turned on the TV and woke him up."

Kimberly took Kaysha for regular medical check-ups, including one a couple of days before she moved to California, and apart from a respiratory issue treated with steroids, Kaysha was healthy.  A couple of weeks before Christmas 2003, the family, including defendant and Kimberly's son Andreas moved to live with Kimberly's mother in Woodland.   It was stipulated that just before then, defendant had been in jail in Washington, from December 3-13, 2003.

Defendant became aggravated with Kaysha when she cried, and he would scream in the baby's face.  He withdrew from the family and kept to himself, and Kimberly did not have him watch the baby as much.  On January 9, 2004, Kimberly bought a mobile phone, and as she walked back home with Andreas and Kaysha, defendant walked up to her quickly and called her a bitch.  Because of this, her mother threw defendant out of the house, but then allowed him to return; after that, he became "very quiet and withdrawn."  Once when Kimberly and her mother went shopping, they returned home to find Kaysha had a "big bruise" and "huge knot" on her forehead.  Defendant said Kaysha hit her head on a swing, an event Kimberly had witnessed earlier that day, but she had not seen this cause a bruise.

Kimberly testified that January 11, 2004, a Sunday, was "a good day" and the family played at a park.  At dinner, Kaysha ate mashed potatoes and gravy for the first time and was not fussy.  After dinner Kimberly and defendant walked to a store to buy diapers, and [Fields'] mood "was fine."  At about 11:00 p.m., Kimberly changed Kaysha's diaper and put her in her crib.  After watching Jay Leno, or a

similar late night program, Kimberly went to sleep.  She woke up when she heard Kaysha make "a really short cry" and she realized Kaysha had been taken to the living room.  She then heard "a weird noise" that "sounded like a big long, long burp, lots of air coming out of her, and I could hear [[Fields]] patting her back ."  She got up and asked him what the noise was and he told her "it's nothing, go back to bed." She went back to bed, but then heard a "snuffling" noise and asked [Fields] what the noise was, but she then fell asleep.

[Fields] later woke Kimberly up, saying something was wrong with Kaysha. Kimberly found Kaysha on the couch, not breathing.  She picked the baby up and screamed at [Fields] to call 911, but "he just stood there and stared at me," so she woke her mother, again screamed at [Fields] to call 911, then called 911 herself.

Kimberly testified she had a misdemeanor petty theft conviction from Washington.

Kimberly's mother testified that she had seen [Fields] rocking the baby improperly and warned Kimberly not to let him babysit.  When she awoke to Kimberly's screaming on the night in question, she saw [Fields] was "very calm, very nonchalant, very laid back."

Kimberly's stepfather testified he told [Fields] to stop rocking the baby by pulling her towards his chest.  Between the cell phone incident and Kaysha's death, [Fields] became ruder and did not speak to the family.  When Kaysha was put in the ambulance, [Fields] did not seem upset and was "just standing there" on the sidewalk.  The stepfather admitted a voluntary manslaughter conviction.

Woodland Police Officer John Perez testified that at about 3:15 a .m. on January 12, 2004, he responded to a call of a baby not breathing.  Kimberly and her mother were hysterical, but [Fields] "appeared not concerned really what was going on" and did not follow anyone to the ambulance.  [Fields] told Officer Perez he had been "up and down with the baby all night" and "[a]bout twenty minutes before we arrived he said he had woke up with the baby, had given the baby a pacifier and wrapped her in the blanket and put her back to sleep on the couch in the living room and he went to bed back in the bedroom.  [¶]  Approximately ten minutes later he woke up because he said something didn't seem right or feel right, so he went and checked on the baby, and when he did he told me that the baby didn't appear to be breathing.  So he went and woke up Kimberly and told her that."  [Fields] also said he shook the baby to try to wake her up and called 911.  While giving Officer Perez this information, [Fields] "showed little emotion, didn't ask about the welfare of his daughter at that time."  When [Fields] asked about her 10 to 20 minutes later, and was told she was at the hospital, he "didn't show a whole lot of emotion."

[Fields] did not go to the Woodland hospital, nor, after the baby was taken to the UC Davis Medical Center, did he go there.  Kaysha was then taken off life support and died.

The next morning, [Fields] called Kimberly, and "said he didn't know where he was, but he was never coming back."  When Kimberly told [Fields] he was wanted for murder, "he screamed and hung up the phone."

3

Former Woodland Police Detective Jack Scoggins testified that he watched [Fields] being interviewed while Kaysha was in the hospital, and [Fields] did not react when an officer gave him news about Kaysha's condition. Later, during an approximate two-hour period he spent with [Fields] by the apartment while it was being searched, [Fields] made small talk and did not express concerns about Kaysha.

On the night of January 12, [Fields] left Detective Scoggins a message stating he was going to San Jose to stay with his brother, and he had nowhere else to stay. Kimberly called Detective Scoggins the next morning to say [Fields] had called her, and Detective Scoggins traced the call to a bus station in San Jose. [Fields] was arrested at a Los Angeles bus station.

A Los Angeles police sergeant testified that [Fields] gave him a false name at the bus station.

Several treating and expert witnesses described Kaysha's injuries. Dr. Jordan Kramer, an emergency room doctor at Woodland Memorial Hospital, testified that when Kaysha was brought in at 3:30 that morning, although she eventually regained a pulse, she had no signs of brain activity. She was sent to UC Davis Medical Center because it has a pediatric intensive care unit. There, Kaysha was treated by Dr. Negar Sheibani, who confirmed that Kaysha had no brain activity. The family consented to withdraw life support, and Kaysha died within minutes.

Dr. Sandra Gorges, a pediatric radiologist with training in child abuse, testified Kaysha had separate fractures on both sides of the skull, and a swollen brain. The injuries were caused both by shaking and blunt force or "major" trauma. A short fall would not cause such injuries, but possibly a fall down a flight of stairs could. An X-ray revealed 17 rib fractures on both sides, of two separate ages; 15 were healing and had been inflicted at least a couple of weeks before death, the others were fresh, less than a week old. These rib fractures were not caused by CPR, but by squeezing. The left arm had a healing fracture, at least two weeks old. The right calf bone (tibia) had a "corner fracture" which "is highly suspicious for nonaccidental trauma and results from the twisting mechanism, and there was an adjacent fracture of the smaller bone in the calf, the fibula, adjacent to the tibia fracture on the right." Kaysha's abdomen was swollen, which could have been from a soft-tissue injury.

Dr. Kevin Coulter, an expert in child abuse, also had the opinion that Kaysha had been battered.

Forensic pathologist Dr. Stephany Fiore conducted the autopsy. Kaysha's skull had "extensive" fractures. Her healing rib fractures had been caused "about a week to a month" before.[2]

---

[2] *Id.* at *1-3.

## II.  GROUNDS RAISED/DEFENSES

In his Petition, Fields raises six grounds:  (1) the trial court imposed an unnecessary eleven-day interruption in the midst of jury deliberations; (2) inconsistent evidentiary rulings; (3) failure to instruct the jury on the lesser-included offense of involuntary manslaughter; (4) ineffective assistance of trial counsel (failure to put the prosecution's case to a meaningful adversarial testing); (5) ineffective assistance of trial counsel (utter failure to defend against charges); and (6) prosecutorial misconduct (withholding of exculpatory evidence).  Respondent does not raise any affirmative defense.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[3]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[4]  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.[5]  Thus, where holdings of the Supreme Court

---

[3] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[4] *Williams*, 529 U.S. at 412 (alteration added).

[5] *Early v. Packer*, 537 U.S. 3, 10 (2002).

regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[6]  When a claim falls under the "unreasonable application" prong, a state court's application of Supreme Court precedent must be "objectively unreasonable," not just "incorrect or erroneous."[7]  The Supreme Court has made clear that the objectively unreasonable standard is "a substantially higher threshold" than simply believing that the state-court determination was incorrect.[8]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[9]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[10]  Because state court judgments of

---

[6] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[7] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[8] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

[9] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[10] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

conviction and sentence carry a presumption of finality and legality, the petitioner has the burden

of showing by a preponderance of the evidence that he or she merits habeas relief.[11]

The Supreme Court recently underscored the magnitude of the deference required:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal
> court relitigation of claims already rejected in state proceedings.  *Cf. Felker v.
> Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing
> AEDPA's "modified res judicata rule" under § 2244).  *It preserves authority to issue
> the writ in cases where there is no possibility fairminded jurists could disagree that
> the state court's decision conflicts with this Court's precedents.  It goes no farther.*
> Section 2254(d) reflects the view that habeas corpus is a "guard against extreme
> malfunctions in the state criminal justice systems," not a substitute for ordinary error
> correction through appeal.  *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct.
> 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition
> for obtaining habeas corpus from a federal court, a state prisoner must show that the
> state court's ruling on the claim being presented in federal court was so lacking in
> justification that there was an error well understood and comprehended in existing
> law beyond any possibility for fairminded disagreement.[12]

In applying this standard, this Court reviews the "last reasoned decision" by the state

court.[13]  State appellate court decisions that summarily affirm a lower court's opinion without

explanation are presumed to have adopted the reasoning of the lower court.[14]  This Court gives

---

[11] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v.
Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas
relief on the basis of little more than speculation with slight support").

[12] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

[13] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297
F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining
"how federal courts in habeas proceedings are to determine whether an unexplained order . . .
rests primarily on federal law," and noting that federal courts must start by examining "the last
reasoned opinion on the claim . . . . ").

[14] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting
a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest
upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider
the issue has recognized, determining whether a states court's decision resulted from an
unreasonable legal or factual conclusion does not require that there be an opinion from the state

the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court.[15]

Under California's unique habeas procedure, a prisoner who is denied habeas relief in the superior court files a new original petition for relief in the court of appeal.  If denied relief by the court of appeal, the defendant has the option of either filing a new original petition for habeas relief or a petition for review of the court of appeal's denial in the California Supreme Court.[16] This is considered as the functional equivalent of the appeal process.[17]  Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[18]  This presumption applies to state-trial courts and appellate courts alike.[19]

A state court is not required to give reasons before its decision can be deemed to be "adjudicated on the merits."[20]  When there is no reasoned state-court decision denying an issue

---

court explaining the state court's reasoning.").

[15] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[16] *See Carey v. Saffold*, 536 U.S. 214, 221-22 (2002) (citations omitted) (discussing California's "original writ" system).

[17] *See id.* at 222 ("Thus, typically a prisoner will seek habeas review in a lower court and later seek appellate review in a higher court . . . .").

[18] 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . ." (citing 28 U.S.C. § 2254(e)(1))).

[19] *See Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004) ("Stevenson does not address these factual findings, let alone challenge them with clear and convincing evidence. Accordingly, we presume them to be correct." (citing 28 U.S.C. § 2254(e)(1); *Pollard v. Galaza*, 290 F.3d 1030, 1035 (9th Cir. 2002))).

[20] *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011).

presented to the state, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."[21] "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."[22]   Where the presumption applies, this Court must perform an independent review of the record to ascertain whether the state-court decision was "objectively unreasonable."[23]   In conducting an independent review of the record, this Court presumes that the relevant state-court decision rested on federal grounds,[24] giving that presumed decision the same deference as a reasoned decision.[25]   The scope of this review is for clear error of the state court ruling on the petition:

> [A]lthough we cannot undertake our review by analyzing the basis for the state court's decision, we can view it through the "objectively reasonable" lens ground by *Williams* . . . . Federal habeas review is not *de novo* when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law.  Only by that examination may we determine whether the state court's decision was objectively reasonable.[26]

---

[21] *Id.* (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

[22] *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

[23] *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (quoting *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam)).

[24] *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991) ("The presumption at present applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law, that is, in those cases where a federal court has good reason to question whether there is an independent and adequate state ground for the decision."); *see also Harris*, 489 U.S. at 263.

[25] *Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[26] *Delgado v. Lewis* (*Delgado II*), 223 F.3d 976, 982 (9th Cir. 2000) (citation omitted). *But cf. Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) ("Our standard of review is not controlled by *Delgado v. Lewis* . . . There, we held that where a state court provides no rationale

"[A]lthough we independently review the record, we still defer to the state court's ultimate decision."[27]

## IV.  DISCUSSION

### A.    Evidentiary Hearing

Fields requested an evidentiary hearing in his habeas petition to the Yolo County Superior Court on the prosecutorial misconduct claim.  In his Petition, Fields requests an evidentiary hearing to further the record; however, Fields does not indicate on which grounds he requests an evidentiary hearing or what evidence is expected to be produced at that hearing.

The Supreme Court made clear in *Pinholster* that "review under [28 U.S.C.] § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."[28]  "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings."[29]  "If the state-court decision 'identifies the correct governing legal principle' in effect at the time, a federal

---

for a decision, a habeas court does not apply de novo review, but instead determines whether the state decision was objectively unreasonable based on its independent reading of the record.  Here, however, the state court was not silent as to its reasoning . . . .  Therefore, we review de novo whether Lewis waived his right to conflict free counsel . . . .").

[27] *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

[28] *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011); *see Townsend v. Sain*, 372 U.S. 293, 312-13, 319 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *superceded in part by statute*, 28 U.S.C. 2254(e)(2) (1996).

[29] *Williams v. Taylor*, 529 U.S. 420, 437 (2000) (quoted with approval in *Pinholster*, 131 S. Ct. at 1401); *see Harrington v. Richter*, 131 S. Ct. 770, 787 (noting that the basic structure of federal habeas jurisdiction is designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions); *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977) ("[T]he state trial on the merits [should be] the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative federal habeas hearing.").

court must assess whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.'"[30]  As the Supreme Court noted, "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court."[31]  Although under *Pinholster* an evidentiary hearing in a federal habeas proceeding is not absolutely precluded, *Pinholster* also made clear that the discretion to grant a request for an evidentiary hearing is cabined by § 2254(e)(2),[32] which provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
> (A) the claim relies on—
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Fields' request in this case does not meet that standard, and his request for an evidentiary hearing is **DENIED**.

**B.     Claims**

Ground 1: Eleven-Day Interruption in Jury Deliberations

The California Court of Appeal summarized Fields' claim and the facts underlying it:

> [Fields] contends the trial court improperly allowed the jury to take a long break during deliberations.  This claim is forfeited, and even if it were not forfeited,

---

[30] *Pinholster*, 131 S.Ct. at 1399 (quoting *Williams*, 529 U.S. at 405).

[31] *Id.*

[32] *Id.* at 1400-01.

[Fields] has failed to demonstrate prejudice.  The background to this claim is involved, but necessary to relate in detail.

During jury selection, the trial court explained that the courtroom would be "dark" the week of Thanksgiving *and* the following week, so that if the trial continued beyond Friday, November 16, it would resume on December 3, 2007 (further dates are to 2007). This was again mentioned during trial, when defense counsel expressed the hope that the trial would finish before the anticipated two-week break.  The trial judge said that although he would be on vacation, the jury might be able to deliberate Thanksgiving week with another judge covering for him.

The jury began deliberations late on Thursday, November 15, deliberated all day on Friday, November 16, and was instructed to return on Tuesday, November 27. November 22 and 23 were judicial holidays, Thanksgiving Day and the Friday after Thanksgiving. (Code Civ. Proc., § 135.)  Thus, although the jury was not going to return for 11 *calendar* days, the jury was going to miss only four *court* days: Monday through Wednesday, November 19 to 21, and Monday, November 26.

The record reflects no objections to this break.

Further, the jury had sent the court the following note at 3:15 p .m., on Friday, November 16:  "The jury deliberations will continue beyond today.  We wish to reconvene Tuesday, November 27th at 9:00AM."  The jury continued deliberating and sent in a final note that day asking that the court reporter be prepared on November 27 to read back certain testimony.  Thus, the jury had asked to come back *earlier* than the date that had already been planned, December 3.

As the trial judge (Johnson, J.) had suggested, another judge (Mock, J.), covered for him during his vacation.  The jury deliberated on Tuesday, November 27, requested readbacks of testimony and the People's closing argument, and asked if the jury could convict [Fields] of child homicide but acquit him of murder.  The jury deliberated for a couple of hours on November 28 before acquitting [Fields] of first degree murder but finding him guilty of second degree murder and child homicide.

Defense counsel's declaration in support of a new trial motion stated in part:  "On November 16, 2007, I was told by the clerk in Department 5 that the jury had broken at approximately 4:00 p.m. but had announced they would not be back until November 27th!"  This statement implies that defense counsel did not know of or acquiesce in the jury's request.  At the hearing on the motion, defense counsel asserted that "something happened" the day the break was requested, but he had had no chance to object.  The trial court denied the new trial motion, in part observing, correctly, that the parties and the jury had been told during voir dire about a long break.[33]

The court rejected Fields' contentions, holding:

On appeal, [Fields] renews the claim of prejudicial error.

---

[33] *Fields*, 2009 WL 2586773 at *3-4.

There is nothing *inherently* improper about a break during deliberations, and such breaks are within the discretion of the trial court. "The jurors sworn to try an action may, in the discretion of the court, be permitted to separate or be kept in charge of a proper officer." (Pen. Code, § 1121; see *People v. Santamaria* (1991) 229 Cal.App.3d 269, 276-277 (*Santamaria* ).)

[Fields'] failure to object to the break, announced at and anticipated by the parties since jury selection, forfeits the claim that the trial court improperly exercised its discretion in this matter. (*People v. Ochoa* (2001) 26 Cal.4th 398, 440 (*Ochoa* ), disapproved on another point as explained in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn.14; *People v. Johnson* (1993) 19 Cal.App.4th 778, 792-794 (*Johnson* ).) Indeed, the break was scheduled to be longer, but Judge Mock covered for Judge Johnson to allow the jury to resume deliberations earlier than planned.

[Fields] claims "the magnitude of the error" makes the lack of objection "irrelevant[.]" But the length of the break is not unique among cases applying forfeiture analysis, and does not show that any error occurred or that the lack of objection is irrelevant. (See *Ochoa, supra,* 26 Cal.4th at p. 440 [nine day break, including five court days, claim forfeited]; *Johnson, supra,* 19 Cal.App.4th at pp. 791-794 [17 days, including nine court days, claim forfeited].)

[Fields] relies on *Santamaria, supra,* 229 Cal.App.3d 269 for the proposition that no objection was necessary. That case has a potentially misleading passage in a footnote that has been explained as follows:

> "In *Santamaria,* as opposed to the present case, the parties did *not* previously agree to and consent to an adjournment during deliberations; since the adjournment was caused by the fact that the trial judge was leaving town, the parties sought to have another judge take the verdict, so that the jury could continue its deliberations as allowed by section 1053. The trial court irrationally denied this request for no good reason, thus abusing its discretion. [Citation.] [¶] The actual holding in *Santamaria,* thus, provides no comfort to appellants here . . . . [¶] Appellants, however, rely upon problematic and ambiguous language contained in a dictum, in a footnote to the *Santamaria* decision. Following the argument and submission for decision of the appeal in *Santamaria,* the People sought permission to vacate the submission and file new evidence with the Court of Appeal regarding the issue of the defendant's supposed failure to object. [The *Santamaria* court] . . . refused this untimely request: . . . 'We have denied this belated request; the court's abuse of discretion here was of such magnitude that whether or not appellant objected is irrelevant.' [Citation.] [¶] We agree with [the *Santamaria* court's] denial of the 'belated request' to produce additional evidence, which was clearly untimely. . . . We also agree the trial court in *Santamaria* abused its discretion by not allowing another judge to take the jury's verdict under section 1053. However, the ambiguous statement in dictum, which comprises the final seven words which close the *Santamaria* footnote quoted above, is problematic and has given rise to concern. Appellants for instance quote it, out of context, as a statement of law that any time a defendant agrees

to any break in deliberations at trial, he can nevertheless complain about the matter for the first time on appeal.  [¶]  Appellants' interpretation of the ambiguous *Santamaria* dictum is clearly wrong.  The jury often breaks its deliberations, with the consent of counsel for the parties, for lunch or dinner, or to return home to sleep.  Deliberations often do not continue on Sundays and holidays.  The *Santamaria* court never intended to call such practices into question.  Nor does the *Santamaria* court opine, even in dicta, that an appellant who has affirmatively agreed to even a long break in deliberations may bide his time and later complain about the matter on appeal, as appellants seek to do here." (*Johnson, supra,* 19 Cal.App.4th at pp. 792-793; see *Ochoa, supra,* 26 Cal.4th at pp. 440-441 [*Santamaria* "did not purport to abrogate the duty to object generally"].)

In sharp contrast to *Santamaria,* in this case the trial judge *did* arrange for another judge to cover his calendar, thereby *shortening* the planned break.  Further, the four court days actually "lost" as a result of the break were Monday through Wednesday, November 19 to 21, and Monday, November 26.  Thanksgiving was on Thursday, November 22 that year.  Contrary to appellate counsel's apparent view, we do not think forcing the jury to deliberate in a child murder case in the days before Thanksgiving was necessary, but instead view it as a logical respite for the jurors, allowing them to have a normal holiday week with their families.  The break here does not reflect an abuse of discretion under state law, and does not come close to showing a federal due process violation.

Appellate counsel asserts there was no tactical reason for not objecting, and claims trial counsel was incompetent.  Where the reasons for trial counsel's failure to object to an alleged error are not revealed by the record, the claim of incompetence "must be rejected on appeal unless counsel was asked for an explanation and failed to provide one or there can be no satisfactory explanation." (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 467 (*Mitchell* ).)  In this case, trial counsel could rationally have concluded that the jurors would be unhappy at any curtailment of the promised break around the holiday.  (See *Johnson, supra,* 19 Cal.App.4th at p. 792 ["Tactically, there would be no reason why a defendant would necessarily want to force the jury to continue to deliberate without ceasing, against a Christmas holiday deadline; this could lead to a very quick and unfavorable verdict"].)

Nor can [Fields] show prejudice, another element of a claim of incompetent counsel.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218 (*Ledesma*); *Mitchell, supra,* 164 Cal.App.4th at pp. 466-467.)  Despite his efforts at parsing what the jury may have been thinking, there is no indication the break affected deliberations.

For example, trial counsel attested during the new trial proceeding that he had been "getting nods of affirmation from several jurors" during closing arguments.  On appeal, [Fields] would have us infer this meant the jurors were leaning towards the defense, but then, during the break, changed their minds.  Even if jurors *were* nodding, at best that may show they *understood* the defense argument, but we cannot conclude it meant they *agreed* with the defense argument.  Further, even if they did, it is speculation to infer the break caused them to change their minds.  Until the jury

14

is polled and the verdicts are recorded, every juror is free to change her or his mind. (Pen.Code, §§ 1163-1164; see *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 256.) Appellate counsel also parses the sequence of jury questions, readback requests and so forth, in an effort to divine what the jurors thought *before,* as opposed to *after,* the Thanksgiving break.  The jurors' ultimate thoughts were revealed by their verdict. It is speculation to infer the break induced them to conclude [Fields] murdered his daughter.

[Fields'] theory of prejudice also hinges on his view that the case was close and the defense "proffered the viable theory that the injury could have been suffered when [Kimberly] Linares had access to the child at about 2:00 a.m.  The earlier injury to the victim's ribs could have been suffered when [he] Johnnie was in custody."

This was not a close case.  [Fields'] theory fails to explain: his lack of interest in his four-month-old daughter's well-being after it was clear she was seriously ill; his abrupt departure from the home; his flight to Los Angeles, showing his consciousness of guilt; and the utter lack of motive for Kimberly to kill her daughter. This failure to explain is highlighted by the evidence that [Fields] had been rough with his daughter before she was killed by heavy blows to both sides of her head.

Accordingly, we reject [Fields'] claim that the break during jury deliberations compels reversal in this case.[34]

The fatal flaw in Fields' position is that, as he candidly acknowledges in his Traverse, the Supreme Court has never suggested or definitively held what constitutes a permissible break in jury deliberations.  Although Fields asks this Court to make that determination in this case, this Court may not do so.[35]  Fields is not entitled to relief under his first ground.

Ground 2:  Evidentiary Rulings

Fields contends that the trial court permitted the prosecution to attack Fields' character but impermissibly refused to permit the defense to impeach the primary prosecution witness with four prior acts of moral turpitude.  The California Court of Appeal rejected Fields' arguments:

---

[34] *Fields*, 2009 WL 2586773 at *4-7.

[35] *Musladin*, 549 U.S. at 77 (2006); *see Van Patten*, 552 U.S. at 126; *Kessee*, 574 F.3d at 678-79; *Moses*, 555 F.3d  at 753-54.

[Fields] contends the trial court made inconsistent evidentiary rulings, allowing evidence of his past bad conduct, but limiting such evidence against Kimberly, arguing "the scales of justice were egregiously imbalanced" thereby.

[Fields] first contends the trial court wrongly excluded evidence of Kimberly's theft convictions.  This claim is not supported by the record on appeal.  [Fields] moved in limine to preclude the People from impeaching him with prior convictions.  He also moved to impeach Kimberly with four prior theft convictions.  The trial court indicated [Fields'] convictions for assaults, possession of a firearm and harassment, if a felony, were admissible to impeach him.  However, the trial court deferred a final ruling on Kimberly's priors, in part because the documentation was incomplete.  At trial Kimberly admitted one theft conviction.

On appeal, [Fields] asserts the trial court should have allowed him to impeach Kimberly with her other convictions, and trial counsel was incompetent in failing to press the issue or obtain a ruling on the record.  However, there is nothing in the record to show that Kimberly *had* more than one admissible theft conviction.  The most plausible scenario is that when additional documentation about her criminal records was obtained, it revealed this fact.  On this record we will not infer that admissible impeachment evidence was excluded, nor that trial counsel was incompetent.  Nor, in any event, and contrary to appellate counsel's claim, would Kimberly have had "a false aura of veracity" because only one of four hypothetical theft convictions had been introduced.

[Fields] next contends the trial court improperly permitted the prosecutor to introduce evidence of his physical and verbal abuse of Kimberly.  [Fields] appears to refer to the testimony that he became enraged when Kimberly bought a cell phone and called her a bitch, and her testimony that before she knew she was pregnant with Kaysha, [Fields] kneed her in the nose, leading to jail time; it is not clear whether he also refers to the incident where [Fields] smacked Kimberly on the head while she was breastfeeding Kaysha.  In any event, his general point is that evidence of "domestic disharmony" was irrelevant and prejudicial.

As the People point out, at least part of this contention is forfeited because the trial court reserved ruling on the incident resulting in [Fields'] jail sentence, and trial counsel did not thereafter lodge an objection.

In any event, [Fields] frames this as a due process violation, claiming the errors deprived him of a fair trial.  Even if we assumed this evidence was inadmissible, "the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*.  [Citations.]  Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test:  The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439 (*Partida* ).)

Contrary to [Fields'] view, this was not a close case, nor was it a "credibility contest" between [Fields] and Kimberly, as he asserts.  [Fields] did not testify; his guilt was abundantly shown by his having had the last known live contact with Kaysha, and as stated above, the absence of evidence of anyone else's motive, his

lack of emotion regarding his daughter's condition, and his flight to Los Angeles. That the jury deliberated for about two and a half days, asked for readbacks, and asked questions, does not show it was torn between conviction and acquittal, as [Fields] speculates. It just shows the jury was taking the evidence and instructions seriously, as it was supposed to do.

With this understanding of the case, we fail to see how the evidence of "domestic disharmony" resulted in a fundamentally unfair trial. Accordingly, assuming the evidence was not admissible, we conclude it is not "reasonably probable the verdict would have been more favorable to the defendant absent the error." (*Partida, supra,* 37 Cal.4th at p. 439.)[36]

The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts."[37] "The introduction of unfairly prejudicial evidence against a defendant in a criminal trial . . . does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental conceptions of justice."[38] "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."[39] In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution."[40] The Supreme Court has made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the

---

[36] *Fields*, 2009 WL 2586773 at *7-8 (emphasis in the original).

[37] *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).

[38] *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir. 1998).

[39] *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983)).

[40] *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

admissibility of evidence.[41]  In this context, the Supreme Court has defined the category of

infractions that violate fundamental fairness very narrowly, limiting them to specific guarantees

enumerated in the bill of rights.[42]  For example, the Supreme Court has barred the introduction of

evidence in state court criminal proceedings that violated the Fourth Amendment (search and

seizure),[43] Fifth Amendment (confessions),[44] Sixth Amendment (Confrontation Clause),[45] and

(right to counsel).[46]  On the other hand, in deciding cases involving the Federal Rules of

Evidence or federal evidentiary statutes, the Supreme Court is acting in its supervisory capacity

over the lower federal courts.[47]  "'Federal courts hold no supervisory authority over state judicial

proceedings and may intervene only to correct wrongs of constitutional dimension.'"[48]

As the California Court of Appeal noted, there is *no evidence* to support Fields' bare

conclusory statement that Linares had more than the one misdemeanor to which she admitted.

Therefore, as to this point, Fields has failed to bear his burden of proving entitlement to relief on

---

[41] *McGuire*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[42] *McGuire*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

[43] *Mapp v. Ohio*, 367 U.S. 643 (1961).

[44] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[45] *Crawford v. Washington*, 541 U.S. 36 (2004); *Pointer v. Texas*, 380 U.S. 400 (1965) (transcript of preliminary hearing without assistance of counsel to confront and cross-examine absent witness inadmissible).

[46] *Burgett*, 389 U.S. at 114-15 (evidence of prior conviction obtained in violation of Sixth Amendment right to counsel inadmissible).

[47] *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006).

[48] *Id.* (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)).

the claim that either he was erroneously precluded from introducing that evidence or that his counsel was ineffective failing to introduce it.[49]

With respect to the admission of Fields' prior bad acts, "[t]o the extent the Supreme Court has addressed the issue, it has expressly reserved consideration of whether the admission of prior bad acts under state law to show propensity constitutes a due process violation."[50]  There being no definitive Supreme Court authority supporting Fields' position, he is not entitled to relief on his second ground.

Ground 3:  Failure to Instruct on Lesser-Included Offense

As he did on direct appeal, Fields argues that the trial court erred in refusing his proffered instruction of involuntary manslaughter as a lesser included offense.  The Appellate Division, applying state law, rejected that argument.[51]

While it is true that due process and the Sixth Amendment to the Constitution require that a jury be correctly instructed as to every element of the crime with which a defendant is charged and convicted,[52] that is not the issue before this Court.  The issue before this Court is whether due process requires that a jury in a criminal trial be instructed as to all necessarily included lesser offenses.  The Supreme Court precedent does not require a trial court to instruct the jury on a lesser included offense in a non-capital case,[53] and the Ninth Circuit has concluded that such a

---

[49] *Silva*, 279 F.3d at 835; *see Bartholomew*, 516 U.S. at 8 (a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[50] *Alberni v. McDaniel*, 458 F.3d 860, 864 (9th Cir. 2006) (citing *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991)).

[51] *Fields*, 2009 WL 2586773 at *8-10.

[52] *See United States v. Gaudin*, 515 U.S. 506, 522–23 (1995).

[53] *Beck v. Alabama,* 447 U.S. 625, 638 (1980).

claim is not cognizable on federal habeas review.[54]  Fields is not entitled to relief under his third

ground.

<u>Grounds 4 and 5:  Ineffective Assistance of Counsel</u>

In his fourth and fifth grounds Fields presents a veritable laundry list of omissions that he

contends constituted ineffective assistance of counsel, including:  (1) inadequate opening

statement and closing argument; (2) failure to object to the eleven-day break in jury

deliberations; (3) inadequate investigation; (4) failure to call an expert to refute the autopsy

report; (5) failure to elicit from the prosecution's forensic witness that the autopsy report did not

indicate when the injury occurred; (6) failure to impeach key prosecution witnesses with their

prior convictions; (7) failure to seek introduction of Linares' mental health records; (8) failure to

compel production of audio tape recordings of conversations between Fields and Linares; (9)

failure to present character witnesses; and (10) failure to excuse a juror who allegedly had a

friendly relationship with a Yolo County assistant district attorney.  Fields presented his first,

second, and sixth claims on direct appeal, and the remainder in his state habeas petition.

The California Court of Appeal rejected Fields' claims that were made on direct appeal.

The Court of Appeal rejection of his second and sixth claims is contained in its holdings on his

first and second ground[55] and are not repeated here.

---

[54] *Solis v. Garcia,* 219 F.3d 922, 929 (9th Cir. 2000); *see* 28 U.S.C. § 2254(d)(1); *Brewer v. Hall,* 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law.").

[55] *See supra* note 34 and accompanying text on pp. 14-15 (break in jury deliberations); *see supra* note 36 and accompanying text on p. 16 (impeachment).

[Fields] contends his trial attorney was incompetent in several respects.  To prevail, [Fields] must show both that trial counsel failed to act within professional norms and that the error or omission caused prejudice, that is, that there was a reasonable probability that, but for counsel's failings, [Fields] would have obtained a more favorable result at trial.  (*Ledesma, supra,* 43 Cal.3d at pp. 217-218.)

We already addressed [Fields'] claims of incompetence regarding the break in jury deliberations and the admission of impeachment evidence against Kimberly and abuse evidence against [Fields], and concluded the record failed to support the claim of prejudice from trial counsel's purported failings.

[Fields] claims trial counsel gave an incompetent *opening statement.*  The style and content of an opening statement is inherently tactical.  In this case, trial counsel gave a seven-page outline of the expected trial evidence.  Appellate counsel faults it because it did not give a "witness by witness" summary.  He cites no authority that such is required, or even desired, in all cases.  He also claims a fact was misstated, specifically, that Kimberly had told her mother she did not want [Fields] left alone with Kaysha.  Trial counsel mentioned this during closing argument, as well.  But at trial, there was testimony Kimberly's mother told Kimberly not to let [Fields] babysit the victim, and testimony from Kimberly that she did not let him do so as much as she had before.  Putting aside the fact that an opening statement is neither evidence nor argument, we fail to see any significant variance between the trial evidence and the opening statement on this point.  Nor would such misstatement cause prejudice.

Appellate counsel faults trial counsel for not objecting or moving for a mistrial at various points where the prosecutor referred to [Fields'] physical conduct against Kimberly, because "the prosecutor had conceded that Johnnie's previous physical conduct was not admissible.  (RT 105)"  Page 105 of the Reporter's Transcript includes a passage where the prosecutor states "there may be some legitimate argument as to the earlier domestic violence since the child wasn't present . . . ."  This is not a concession, but reflects the musings common in colloquy with the court.  The prosecutor did not concede the evidence was inadmissible, as [Fields] asserts.

Appellate counsel faults trial counsel's closing argument, because he failed to point out "a substantial inconsistency" in the People's case.  The claimed inconsistency is that, if [Fields] killed his daughter, why would he wake Kimberly up, instead of going to sleep and letting someone else "make the discovery so that he would not be so closely linked to the event?"  This raises an inference that could have been argued.  But Kimberly testified she woke up earlier in response to a noise from Kaysha, but [Fields] told her "it's nothing, go back to bed."  In light of this testimony, trial counsel could rationally conclude the purported "inconsistency" posed on appeal would not be persuasive to the jury.

Finally, [Fields'] argument for prejudice is not that this was a close case, as he argued earlier in his brief, but that "[t]his was an extremely weak case." We disagree. This was a solid case, for the reasons we have stated before.[56]

The Yolo County Superior Court rejected the arguments Fields advanced in his state habeas petition, holding: "On his ineffective assistance of counsel, petitioner fails to show that counsel's performance was deficient. Even if it was, petitioner fails to show that any alleged deficiency prejudiced him."[57]

Under *Strickland*, to demonstrate ineffective assistance of counsel, Fields must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.[58] A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."[59] Fields must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.[60] An analysis that focuses "solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."[61] An ineffective assistance of counsel claim

---

[56] *Fields*, 2009 WL 2586773 at 10-11 (emphasis in the original).

[57] Lodged Doc. No. 8.

[58] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[59] *Id*.

[60] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

[61] *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *see Strickland*, 466 U.S. at 687; *see also Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." (citing *Strickland*, 466 U.S. at 687)); *United States v. Cronic*, 466 U.S. 648, 656 (1984) ("The

should be denied if the petitioner fails to make a sufficient showing under either one of the

*Strickland* prongs.[62]

The Supreme Court admonished in *Strickland*:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.[63]

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro, supra,* at 473, 127 S.Ct. 1933. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule,

---

right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." (citations omitted)).

[62] *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

[63] 466 U.S. at 689 (internal citations and quotation marks omitted).

the more leeway courts have in reaching outcomes in case-by-case determinations").[64]

It is through this doubly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d)(1) standard.[65]

The Supreme Court, applying the "doubly deferential standard," has made clear that when adjudicating ineffective assistance of counsel claims in federal habeas proceedings, unlike the situation on direct review, focus is not on whether counsel's performance fell below the *Strickland* standard.  Rather, the focus is on whether the state-court decision holding that counsel was not ineffective constituted an "*unreasonable* application of federal law[,] [which] is different from an *incorrect* application of federal law."[66]

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.[67]

The Supreme Court has identified three circumstances under which prejudice is presumed.  First, the complete denial of counsel at any critical stage of a criminal proceeding.  Second, where defense counsel fails to subject the prosecution's case to any meaningful adversarial testing.  Third, in those situations in which counsel is called upon to render assistance under circumstances where competent counsel very likely could not.[68]  To presume prejudice

---

[64] *Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009).

[65] *Id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

[66] *Richter*, 131 S. Ct. at 785 (2011).

[67] *Id.* at 786.

[68] *Bell v. Cone*, 535 U.S. 685, 695-96 (2002) (discussing *United States v. Cronic*, 466 U.S. 468 (1984)).

based upon counsel's failure to test the prosecution's case requires counsel to "entirely fail[] to subject the prosecution's case to meaningful adversarial testing."[69]  Failure to test the prosecution's case only at specific points is insufficient.[70]

Fields bears the burden of proving that counsel's trial strategy was deficient.  "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"[71]  "[Fields] bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy."[72]  "In determining whether the defendant received effective assistance of counsel, 'we will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight,' but rather, will defer to counsel's sound trial strategy."[73]  "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment."[74]

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."[75]  The court must then consider those acts or omissions against "prevailing

---

[69] *Id.* at 697.

[70] *Id.*

[71] *Strickland*, 466 U.S. at 689.

[72] *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001).

[73] *Id.* (quoting *Strickland*, 466 U.S. at 689).

[74] *Strickland*, 466 U.S. at 681.

[75] *Id.* at 690.

professional norms."[76]  Even then, "counsel is strongly presumed to have rendered adequate

assistance and made all significant decisions in the exercise of reasonable professional

judgment."[77]

This Court finds the arguments advanced by Respondent persuasive.  Fields provides no

explanation as to what trial counsel failed to investigate or how it would impact the outcome.

Fields does not even argue, let alone provide any evidence, that any other forensic expert would

provide testimony that was helpful, and the record indicates that counsel did, in fact, consult a

forensic expert before trial, but did not call him.  The claim that counsel was ineffective for

failing to elicit testimony from the pathologist as to the time the fatal injury occurred fails for the

simple reason that the pathologist was not a percipient witness to the injury and, as Respondent

notes, other competent evidence as to the time of the injury was introduced.  Because the

impeaching information (criminal convictions) was brought out on direct examination, it was

hardly ineffective to fail to cover the same ground.  Nor was defense counsel ineffective for

failing to call the character witnesses, who were either family members or close friends, making

their testimony suspect.[78]  Fields provides no evidence that either the medical records or the

audiotapes he contends counsel should have obtained even exist.  Finally, the record does not

support his claim that the jury panel included a juror who was friendly with an assistant district

attorney.[79]

---

[76] *Id.*

[77] *Id.*

[78] *See Gonzalez v. Wong*, 667 F.3d 965, 988 (9th Cir. 2011).

[79] Docket No. 13 at 30-39.

Under the facts in this case, this Court cannot say that the decision of either the Sacramento County Superior Court or the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[80]  Nor, viewing the matter through the doubly-deferential lens of *Mirzayance-Richter*, can this Court find that the state court unreasonably applied the correct legal principle to the facts of the Petitioner's case within the scope of *Andrade-Williams-Landrigan-Richter*; i.e., the state court decision was not more than incorrect or erroneous, its application of clearly established federal law was not objectively unreasonable.  Fields has failed to establish that counsel committed any error that was so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment or that defendant's defense was prejudiced, as required by *Strickland-Hill*.  Fields is not entitled to relief under his fourth and fifth grounds.

<u>Ground 6:  Prosecutorial Misconduct</u>

Fields contends that the prosecutor knowingly withheld several items of exculpatory evidence in violation of his constitutional rights, including: (1) audio tape recordings; (2)  the criminal records of Linares and Ross; (3) Linares' mental health records; (4) the autopsy report showing when the fatal injury occurred; and (5) any deals for leniency made with Linares and Ross in exchange for their trial testimony.  Fields raised this ground in his state habeas proceeding.  The Sacramento County Superior Court denied Fields relief holding:  "On his claim that the People committed a violation under *Brady v. Maryland* (1963) 373 U.S. 83, petitioner fails to show that the People failed to provide material information."[81]

---

[80] 28 U.S.C. § 2254(d).

[81] Lodged Doc. No. 8.

Respondent argues that Fields has not provided any evidence to support his conclusory allegations.  As Respondent correctly notes there is no evidence that some of the material even exists and, in some respects, notably the criminal records of Linares and Ross and the autopsy report, is belied by the record.[82]  This Court agrees.  Just as he did before the state courts in his state habeas proceedings, Fields has failed to shoulder his burden of establishing entitlement to relief.  Fields is not entitled to relief under his sixth ground.

### V.  CONCLUSION AND ORDER

Fields is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[83]  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[84]

The Clerk of the Court is to enter judgment accordingly.

Dated:  September 21, 2012.

          /s/ James K. Singleton, Jr.
          JAMES K. SINGLETON, JR.
          United States District Judge

---

[82] Docket No. 13 at 41-43.

[83] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).

[84] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.